1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

RAFAEL PIMENTEL-ESTRADA,

             Petitioner,

      v.

WILLIAM P. BARR, et al.,

             Respondents.

CASE NO. C20-495 RSM-BAT

ORDER GRANTING MOTION FOR
TEMPORARY RESTRAINING ORDER

## I.       INTRODUCTION

Petitioner Rafael Pimentel-Estrada, Sr., a native and citizen of Mexico, is detained by

U.S. Immigration and Customs Enforcement ("ICE") at the Northwest ICE Processing Center

("NWIPC") in Tacoma, Washington.  Over the last two months the world's understanding of the

grave risks posed by the COVID-19 pandemic has continued to evolve.  Petitioner, in turn, has

learned that his age and medical history put him at a higher risk of serious illness or death if he

contracts the virus.  Petitioner is concerned that Respondents[1] are not taking adequate steps to

---

[1] The Respondents are U.S. Immigration and Customs Enforcement; Nathalie Asher, Director of
the Seattle Field Office of ICE; Matthew T. Albence, Deputy Director and Senior Official
Performing the Duties of the Director of ICE; and Steven Langford, Warden of the NWIPC.  *See*
Dkt. #18 (Am. Pet.) at 1.

ORDER – 1

protect him from the serious risks of COVID-19 and are thereby violating his constitutional

rights to reasonable safety and freedom from punishment while civilly detained.

Currently before the Court is Petitioner's motion for a temporary restraining order

("TRO") directing his immediate release from custody.  Dkt. #19 (Mot.).  Respondents oppose

the motion.  Dkt. #33 (Opp.).  At the direction of the Court, Petitioner filed a reply brief and

supplemental evidence.  Dkt. #37.  Having considered the parties' submissions, the balance of

the record, and the governing law, the Court GRANTS Petitioner's motion.[2]

## II.        BACKGROUND

### A.    Petitioner's Background

Petitioner became a lawful permanent resident of the United States in 1996 and has lived

in this country since.  Dkt. #33-2 (Bostock Decl.) at ¶ 43.  He is 66 years old, a father and

grandfather, and has previously owned several successful businesses.  Dkt. #30 (Pimentel Jr.

Decl.) at ¶¶ 1–3, 32.  In 2013, when Petitioner found himself in trouble with the law, he took

responsibility by pleading guilty to possessing approximately one pound of methamphetamine

with the intent to distribute.  Bostock Decl. at ¶ 44.  He was sentenced to 144 months in prison,

but his sentence was later reduced to 120 months pursuant to 18 U.S.C. § 3582(c)(2).  *Id.*

While serving his sentence, Petitioner took advantage of the educational opportunities

available to him and gained privileged rights within the prison.  Pimentel Jr. Decl. at ¶ 16; Dkt.

#31 (Y. Pimentel Decl.) at ¶ 5.  Because of his behavior, he was ultimately classified as a low-

level risk offender and transferred to a low-level prison satellite camp.  Pimentel Jr. Decl. at ¶ 17.

---

[2] Petitioner's request for oral argument, Mot. at 1, is DENIED.  The parties have thoroughly briefed the issues and oral argument would not be of assistance to the Court.  *See Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998) (court may deny request for oral argument when parties submit briefs to the court); Local Rules W.D. Wash. LCR 7(b)(4).

ORDER – 2

In 2018, Petitioner was released to a half-way house for six months where he complied with all rules and regulations and ultimately was granted home confinement in January 2019. *Id.* at ¶¶ 5–9, 19–24; Y. Pimentel Decl. at ¶ 6. Petitioner moved in with his son, daughter-in-law, and young grandchildren in Utah, where he continued to follow all expectations placed upon him and began to reform connections with his family. Pimentel Jr. Decl. at ¶¶ 25–31; Y. Pimentel Decl. at ¶¶ 6–7.

In May 2019, while attending a required probationary appointment, Petitioner was taken into ICE custody and transferred to the NWIPC. Pimentel Jr. at ¶ 13; Bostock Decl. at ¶ 45. ICE initiated removal proceedings against him due to his controlled substances violations. Bostock Decl. at ¶ 45. An Immigration Judge denied his applications for relief and ordered him removed on August 30, 2019. *Id.* at ¶ 47. His appeal to the Board of Immigration Appeals was dismissed on February 6, 2020. *Id.* at ¶ 48. He then sought review before the Ninth Circuit Court of Appeals, which stayed his removal. *Id.* at ¶ 49; *Pimentel-Estrada v. Barr*, No. 20-70384 (9th Cir.). His petition for review remains pending.

On March 26, 2020, Petitioner filed an Emergency Motion to Secure Release pending resolution of his petition for review, arguing that he should be released considering the threat posed by COVID-19. *See* Dkt. #1. After the motion was fully briefed, the Ninth Circuit construed the motion as a petition for writ of habeas corpus and transferred the matter to this Court for expedited consideration. Dkt. #1-1. On April 3, 2020, Petitioner filed a notice of intent to file an amended habeas petition and to supplement his emergency motion. Dkt. #12.

On April 14, 2020, Petitioner filed an amended petition asserting that his continued detention violates his Fifth Amendment substantive due process rights because of the threat to his health and safety posed by COVID-19. Dkt. #18 (Am. Pet.). The same day, he filed the

pending motion for TRO seeking his immediate release. *See generally* Mot.  Petitioner presents evidence that because of his age and medical history, including hypertension and recurrent respiratory infections, he is at high risk of serious illness or death should he be exposed to COVID-19. *See, e.g.*, Dkt. #23 (Greifinger Decl.) at ¶ 34.  Should Petitioner be released, he and his family plan to have him stay with his son and daughter-in-law in Salt Lake City, Utah.  Mot. at 12–13.

**B.      The Coronavirus and COVID-19**

COVID-19, an infection caused by the novel zoonotic coronavirus SARS-CoV-2 (the "virus" or "coronavirus") has fractured lives and transformed life in incredible ways.  As the virus has spread throughout the world, many governments have been caught flat-footed, necessitating drastic actions to tamp the coronavirus's rampant spread.  Federal, state, and local governments have declared states of emergency, have instituted "stay home" orders, and have implemented widespread "social distancing measures." *See, e.g.*, Proclamation No. 9994, 85 Fed. Reg. 15,337 (March 13, 2020) (finding and proclaiming "that the COVID-19 outbreak in the United States constitutes a national emergency, beginning March 1, 2020"); WASH. GOVERNOR'S PROCLAMATION 20-05 (Feb. 29, 2020) (declaring a state of emergency in Washington State), *available at* https://www.governor.wa.gov/office-governor/official-actions/proclamations.  Even this Court was forced to drastically alter its operations to slow the spread of the virus and save lives. *See, e.g.*, W.D. WASH. GEN. ORDER NO. 02-20 (March 17, 2020) (closing Seattle and Tacoma Courthouses and continuing all trials scheduled to occur before June 1, 2020); W.D. WASH. GEN. ORDER NO. 07-20 (Apr. 14, 2020) (continuing all in-person proceedings scheduled to occur before July 1, 2020).

ORDER – 4

Despite these drastic measures, the virus has become a global pandemic, spreading "easily and sustainably within communities[,] . . . primarily by person-to-person contact through respiratory droplets produced when an infected person coughs or sneezes."  Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 Fed. Reg. 17060, 17062 (Mar. 26, 2020) (internal citations omitted).  The virus also spreads "through contact with surfaces or objects contaminated with these droplets."  *Id.*  There is evidence that the virus can be passed on while an individual is asymptomatic.  Dkt. #21 (Golob Decl.) at ¶ 6.  Once infected, 2-14 days may pass before an individual develops symptoms and some infected individuals may never develop symptoms.  *Id.*

Exposure to the coronavirus causes COVID-19, an infection that has so far infected more than 3 million people globally and has killed more than 208,000.  COVID-19 is ten times deadlier than a severe seasonal influenza.  *Id.* at ¶ 4.  While some individuals may have mild or no symptoms, many require intensive medical care including "supplemental oxygen, positive pressure ventilation, and in extreme case, extracorporeal mechanical oxygenation."  *Id.* at ¶ 5.  There currently are no cures, vaccines, or accepted treatments for COVID-19, and the only effective way to protect vulnerable people from "injury or death from COVID-19 [is] to prevent individuals from being infected with the COVID-19 virus."  *Id.* at ¶ 10.  Even where COVID-19 is not fatal, it can "severely damage the lung tissue, requiring an extensive period of rehabilitation and in some cases a permanent loss of respiratory capacity" or other permanent injuries.  *Id.* at ¶ 9.

While public health recommendations have changed frequently, the U.S. Centers for Disease Control and Prevention ("CDC") has been consistent in advising that certain populations

are at a particularly high risk both for contracting the virus and becoming seriously ill.  *See* CDC,

*Coronavirus Disease 2019-COVID*, *People who are at higher risk for severe illness*,

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html

(last visited Apr. 27, 2020) (*hereinafter* "CDC Guidelines").  The populations at heightened risk

include individuals over the age of 65, those in nursing homes or long-term care facilities, and

those with "underlying medical conditions, particularly if not well controlled." *Id.*  Medical

conditions of concern include lung disease, asthma, serious heart conditions, severe obesity,

diabetes, liver disease, ongoing kidney dialysis, and those causing individuals to be

immunocompromised.[3]  *Id.*  "In the highest risk populations, the case fatality rate is about 15%."

Golob Decl. at ¶ 4.

    To protect vulnerable populations and slow the spread of the coronavirus, the CDC and

other public health experts have focused on the need for social distancing and hand hygiene.

Dkt. #23 (Greifinger Decl.) at ¶ 10; Dkt. #22 (Stern Decl.) at ¶ 3 ("The only way to control the

virus is to use preventive strategies, including social distancing.").

**C.    COVID-19 in Detention Facilities**

    Nursing homes, cruise ships, and detention facilities, by their very nature, make it

incredibly difficult, if not impossible, for individuals to practice both hand hygiene and social

distancing.  The confined and crowded characteristics have driven early outbreaks in nursing

homes, cruise ships, and detention facilities.  Golob Decl. at ¶ 12; Stern Decl. at ¶ 8.

Immigration detention facilities, in particular, are at a heightened risk as they house a great

---

[3] A broad range of conditions can cause individuals to be immunocompromised, "including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications."  CDC Guidelines.

ORDER – 6

number of vulnerable detainees, have close living quarters, and have limited capacity for medical care.  Greifinger Decl. at ¶ 8; Stern Decl. at ¶ 8, Golob Decl. at ¶ 14 (high risk individuals "living in an institutional setting, such as a prison, or jail, or an immigration detention center, with limited access to adequate hygiene facilities, limited ability to physically distance themselves from others, and exposure to potentially infected individuals from the community are at grave risk of severe illness and death from COVID-19").  Social distancing in detention facilities is often impossible as toilets, sinks, and showers are shared, food preparation and service is communal, and detainees share common areas.  Greifinger Decl. at ¶ 8.  Further, staff rotate through the population on a shift basis, providing opportunities for transmission into the facility, especially by asymptomatic carriers.  *Id.*  Indeed, as public health experts have predicted, *see, e.g.*, Golob Decl. at ¶ 13, there have been significant outbreaks in detained populations where the virus spreads "like wildfire."  Greifinger Decl. at ¶ 27.  For example, on April 7, 2020, ICE had confirmed 19 cases of COVID-19 in its detention facilities.  Greifinger Decl. at ¶ 11.  Two weeks later, that number had jumped to 253.  Dkt. #38-1 at 8.  As of April 27, 2020, the number of confirmed cases is 317.  ICE Guidance on COVID-19, Confirmed Cases, https://www.ice.gov/coronavirus (last visited Apr. 27, 2020).  Similarly, in New York City's Rikers Island jail complex, the number of confirmed cases grew from one to nearly 200 over the span of 12 days.  Golob Decl. at ¶ 12.  Further, the U.S. Bureau of Prisons ("BOP") has reported that 799 federal inmates have been infected, 27 have died, and 319 BOP staff have been infected. *See* Federal BOP, Covid-19 Cases, https://www.bop.gov/coronavirus/index.jsp (last visited Apr. 27, 2020).

Indeed, "[t]he only way to control the virus [in these settings] is to use preventive strategies, including social distancing."  Stern Decl. at ¶ 3.  Accordingly, much focus has been

placed on reducing detained populations, and public health experts have recommended that authorities release detained individuals who are at high risk of serious illness or death from COVID-19. *Id.* at ¶ 9 (noting that release is "a critically important way to meaningfully mitigate that risk"); Greifinger Decl. at ¶¶ 5, 33, 35 ("In my opinion, the public health recommendation is to release high-risk people from detention, given the heightened risks to their health and safety, especially given the lack of a viable vaccine for prevention or effective treatment at this stage."). Additionally, experts have recommended the release of detainees who present a low risk of harm to the community to reduce the total number of detainees in a facility and allow for greater social distancing. Stern Decl. at ¶ 9.

Federal and state authorities around the country have been responding to this advice. On the national level, the U.S. Attorney General has directed United States Attorneys to "consider the medical risks associated with individuals being remanded into federal custody during the COVID-19 pandemic" in all detention matters. Memorandum from the Attorney General to all Heads of Department Components and all United States Attorneys (Apr. 6, 2020), *available at* https://www.justice.gov/file/1266901/download. ("Even with the extensive precautions [the Department of Justice is] currently taking, each time a new person is added to a jail, it presents at least some risk to the personnel who operate the facility and to the people incarcerated therein." *Id.* Similarly, the Attorney General advised the Director of BOP to reduce populations by transferring non-violent, vulnerable, and elderly inmates to home confinement. Memorandum from the Attorney General to the Director of Bureau Prisons (March 26, 2020), *available at* https://www.justice.gov/file/1262731/download. Washington State has also acted to reduce the number of state prisoners. WASH. GOVERNOR'S PROCLAMATION 20-50 (April 15, 2020) (directing Washington State Department of Corrections to reduce prison population in response

to COVID-19), *available at* https://www.governor.wa.gov/office-governor/official-actions/proclamations.

**D.    Response to COVID-19 at the NWIPC**

The NWIPC is a private detention center run by The GEO Group, Inc. ("GEO"), an independent contractor that provides the facility, management, personnel, and services for 24-hour supervision of the immigration detainees in ICE custody at the facility.  Bostock Decl. at ¶ 4.  The conditions at the NWIPC are governed by a performance-based contract, a results-oriented method of contracting focused on outputs, quality, and outcomes.  *Id.*  In turn, GEO is required to maintain conditions at the NWIPC in accordance with the Performance-Based National Detention Standards 2011 ("PBNDS").  *Id.* at ¶ 12.  The contract does not designate how GEO is to perform the work, but rather establishes the expected outcomes and results ICE expects.  *Id.* at ¶ 4.  It is GEO's responsibility to meet ICE's requirements.  *Id.*

On April 10, 2020, ICE issued new guidance in response to COVID-19, developed in consultation with the CDC, to "set[] forth *expectations* and assist[] ICE detention facility operators to sustain detention operations, while mitigating risks to the safety and well-being of detainees, staff," and others.  ICE – ENFORCEMENT AND REMOVAL OPERATIONS, COVID-19 PANDEMIC RESPONSE REQUIREMENTS 3 (Apr. 10, 2020) (emphasis added) (*hereinafter* ERO PRR), *available at* https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf.  The new guidelines are "designed to establish consistency across ICE detention facilities by establishing mandatory requirements and best practices [that] all detention facilities housing ICE detainees are *expected* to follow during the COVID-19 pandemic."  *Id.* at 4 (emphasis added).  Under the ERO PRR, GEO is expected to continue complying with its contractual obligations, the CDC

Guidelines, and prior ICE guidance and must also plan for the risks associated with COVID-19. *Id.* at 5. Respondents do not establish whether the ERO PRR guidelines are binding or legally enforceable.

The evidence submitted establishes the following conditions at the NWIPC.

**1.      Population Control**

ICE controls the population at the facility. In response to the threat of the ongoing pandemic, ICE's Officer in Charge of Enforcement and Removal Operations in the Seattle Field Office, Drew H. Bostock, indicates that ICE adjusted enforcement priorities to focus on public safety risks and individuals subject to mandatory detention. Bostock Decl. ¶ 8. ICE also acted to decrease the number of detainees held at its detention facilities. In March 2020, ICE determined which detainees at the NWIPC were at high risk under the CDC Guidelines, including those over 60, and performed case reviews "to determine whether continued detention" was appropriate. *Id.* at ¶ 40. ICE utilized ICE Health Service Corps ("IHSC"), which provides medical care to NWIPC detainees, to review records and identify detainees at the NWIPC who met updated CDC "criteria as potentially at higher risk due to COVID-19." *Id.* at ¶ 41. For those identified by IHSC, ICE conducted "discretionary review" and "released a number of detainees from custody at the NWIPC." *Id.* In April 2020, ICE "expand[ed] on the CDC criteria list of individuals identified as potentially being at higher risk for serious illness from COVID-19" and again "implemented custody reassessment reviews." *Id.* at ¶ 42.

Because of these efforts, the facility is at less than half capacity. Bostock Decl. at ¶¶ 6–11. Nevertheless, despite the overall lower population at the NWIPC, Respondents do not appear to have appreciably reduced the population within individual housing units. *Compare*

Bostock Decl. at ¶¶ 6, 18 n.2 (indicating an April 1, 2020[4] population of 792 detainees and 21 housing units—allowing for less than 40 detainees per housing unit); Dkt. #28 (Dawson Decl.) at ¶ 3 (housing unit with approximately 25 detainees), *with* Dkt. #24 (Espinoza Esparza Decl.) at ¶ 3 (housing unit with approximately 80 detainees); Dkt. #25 (Lopez Gonzalez Decl.) at ¶ 9 (housing unit with approximately 70 detainees); Dkt. #26 (Lopez Nuñez Decl.) at ¶ 5 (housing unit with approximately 65 detainees); Dkt. #27 (Plutin Hernandez Decl.) at ¶ 4 (housing unit with approximately 100 detainees); Dkt. #40 (Jimenez-Espino Decl.) at ¶ 3 (housing unit with approximately 60 detainees as of April 15, 2020).

## 2. Decreasing Staff and Visitors

Respondents have also reduced the number of people entering the NWIPC by suspending social visitation and cancelling tours. Bostock Decl. at ¶¶ 23–24. Under the ERO PRR, GEO is to determine minimum staffing levels and ensure that "staff can stay home when sick." ERO PRR at 7. The number of people working at the NWIPC has been decreased by encouraging teleworking, where possible. Bostock Decl. at ¶ 31. Necessary visitors, such as contractors, vendors, and attorneys, are screened by GEO prior to entering the facility with a temperature check and a questionnaire to determine whether the individual is experiencing any possible COVID-19 symptoms or may have been exposed to COVID-19. *Id.* at ¶¶ 4, 25, 28. Most visitors are limited to noncontact visits and those that are specially approved for contact visits must wear personal protective equipment ("PPE"), including a mask. *Id.* at ¶ 26.

Staff who must work at the NWIPC undergo temperature screening upon entering the facility and are encouraged to stay home if they are sick, experiencing any possible COVID-19

---

[4] As of April 15, 2020, Respondents had reduced the population further, to 747 detainees. Bostock Decl. at ¶ 6. The Court points to the April 1, 2020 population because Petitioner's first set of additional detainee declarations are from approximately the same date.

symptoms, or have been in close contact with someone diagnosed with COVID-19.  *Id.* at ¶¶ 28, 30.  According to public health experts, however, these measures are insufficient to prevent the introduction of the coronavirus into the facility by asymptomatic individuals.  Greifinger Decl. at ¶ 22.  Staff have likewise been advised on the steps to take to prevent the spread of COVID-19 within the facility and are provided access to hand sanitizer and masks.  *Id.* at ¶ 30.  While Respondents indicate they have a good working relationship and share information, GEO is not required to notify ICE if any of its staff members have been tested or diagnosed with COVID-19.  *Id.*

### 3.    Arriving Detainees

New detainees entering the facility must be "afforded the opportunity to shower and provided with clean clothing, bedding, towels and personal hygiene items."  *Id.* at ¶ 16.  New detainees are also being provided "an instructional flyer outlining proper hand washing hygiene and the importance of covering coughs."[5]  *Id.* at ¶ 17.  In addition, Respondents have undertaken screening of all incoming detainees.  Since March 26, 2020, IHSC does a temperature check and discusses possible COVID-19 exposure with every new detainee before they enter the facility.  *Id.* at ¶ 15; Dkt. #33-3 (Rivera Decl.) at ¶ 8.

New detainees are observed for 14 days before being introduced to the general population.  Bostock Decl. at ¶ 18.  GEO has dedicated three housing units with individual cells to house new detainees (one for female detainees and two for male detainees).  *Id.* Those new detainees who present signs or symptoms of COVID-19 are placed in isolation and tested, if appropriate.  Rivera Decl. at ¶ 9.  Similarly, those who have or may have been exposed to a

---

[5] Similar posters advising of ways to reduce the spread of the coronavirus have also been posted in multiple languages in each housing unit of the facility.  Bostock Decl. at ¶ 17.

confirmed case are isolated until the end of the 14-day observation period or until it is

determined that there was no exposure to a positive case. *Id.* at ¶ 10. If a new detainee is

identified by IHSC or GEO as meeting "the CDC's identified populations potentially being at

higher-risk for serious illness from COVID-19," the detainee is not isolated, but the information

is shared with ICE. *Id.*; ERO PRR at 5.

All new detainees who are not isolated are housed together for the 14-day observation

period. Bostock Decl. at ¶ 18. Individual cells can house up to four detainees, and GEO groups

detainees who enter on the same day and who have similar risk classifications. *Id.* During the

14-day observation period, detainees are not permitted to commingle with other detainees in

common areas.[6] *Id.* If a detainee within an individual cell exhibits COVID-19 symptoms, all

detainees within that cell are observed for an additional 14-day period. Rivera Decl. at ¶ 10. If

detainees within an individual cell do not display symptoms of COVID-19 during their 14-day

observation period, they are released to general housing units. Bostock Decl. at ¶ 18.

### 4.     Care and Testing of Possible COVID-19 Patients

NWIPC detainees may seek medical care from IHSC at an in-house medical clinic.

Providers are directed to screen for "signs and symptoms compatible with COVID-19," but

neither ICE nor IHSC have developed any specific criteria for ordering COVID-19 testing and

instead leave it to the individual clinician. Rivera Decl. at ¶ 8; Greifinger Decl. at ¶ 16(d)

("There is no guidance on when to test people."). Numerous detainees represent that they are

---

[6] The record is not clear whether "common areas" refers to shared spaces within a housing unit or to the additional facilities that are made available to all detainees and where mingling between housing units may occur. *See* ERO PRR at 13 (directing facilities to facilitate social distancing by extending "recreation, law library, and meal hours and stagger detainees' access to the same in order to limit the number of interactions between detainees from *other housing units*") (emphasis added).

themselves exhibiting symptoms of COVID-19 or have heard of or observed others exhibiting such symptoms.  Jimenez-Espino Decl. at ¶¶ 8–10 (detainee indicating that for three days he has been sick with chills, fever, shaking, and a sore throat and recounting prior detainees exhibiting symptoms); Dkt. #41 (Ramirez-Alatorre Decl.) at ¶¶ 2–12 (detainee detailing underlying medical issues and the onset of "diarrhea, fever, headaches, and sore throat" and noting that five other co-detainees have developed symptoms); Dkt. #42 (Trejo Flores Decl.) at ¶¶ 3–5 (detainee complaining of dry cough, nasal congestion, and chills and noting that about three co-detainees "are sick and are coughing").  However, detainees complain that despite many exhibiting symptoms consistent with COVID-19 and numerous requests to IHSC, they are not aware of any detainees being tested.  Jimenez-Espino Decl. at ¶¶ 9–10 (noting that declarant and others have not been tested despite symptoms compatible with COVID-19); Ramirez-Alatorre Decl. at ¶¶ 8, 11 (same); Trejo Flores Decl. at ¶¶ 5, 7 (same); Dkt. #25 (Lopez Gonzales Decl.) at ¶¶ 17–19 (same).

As of April 3, 2020, three detainees had been tested for COVID-19, and all three test results were negative.  Dkt. #33-4 (Malakhova Decl.) at ¶ 7.  Respondents have not submitted any evidence that additional tests have been ordered since this date, but they submit that as of April 16, 2020, there had been no confirmed cases at the NWIPC.  Bostock Decl. at ¶¶ 18, 30 (no detainees with confirmed cases and "no ICE or GEO employees or staff at the NWIPC have reported being diagnosed with or testing positive for COVID-19").  However, there has been at least one scare.  On April 11, 2020, an ICE detainee tested positive for COVID-19 after being transferred from the NWIPC to another ICE detention facility.  *See Dawson*, Case No. C20-

ORDER – 14

409JLR, Dkts. #93 and #93-1 (W.D. Wash. Apr. 14, 2020).[7]  The detainee, who was transferred on March 31, 2020, began exhibiting symptoms on April 4, 2020.  *Id.*  Instead of testing NWIPC detainees who were housed with the detainee who tested positive, Respondents reviewed their medical records and monitored their health. *Id.*  Respondents do not believe that any of these detainees exhibited signs or symptoms of COVID-19 and have concluded that the detainee was exposed to the coronavirus after he was transferred.  *Id.*

### 5.   Social Distancing

Perhaps the biggest challenge to controlling the spread of COVID-19 is presented by the communal conditions in the NWIPC.  In almost all aspects, life among detainees is a shared experience that does not allow for social distancing.  *See e.g.*, Dkt. #39 (Petitioner Decl.) at ¶ 6 ("social distancing is impossible because we live in such close quarters and are close to so many other people all the time"); *see generally* Lopez Gonzales Decl. at ¶¶ 4–8; Lopez Nuñez Decl. at ¶¶ 4–12; Dawson Decl. at ¶ 3–7; Plutin Hernandez Decl. at ¶ 5–6.  Detainees share the limited bathroom, bathing, and handwashing facilities, which results in crowding.  Throughout the day, detainees share tablets, exercise equipment, phones, and various other surfaces throughout their shared living space.  For meal times, detainees form lines and then must sit directly next to each other because seating is limited.  There is no evidence that Respondents have added tables or otherwise made accommodations in response to COVID-19 that would allow detainees to adequately space themselves while eating.  *Compare* Jimenez-Espino Decl. at ¶ 4, *with* Espinoza Esparza Decl. at ¶ 5; Lopez Gonzalez Decl. at ¶ 6; *and* Lopez Nuñez Decl. at ¶ 7.  Additionally,

---

[7] The Court can take judicial notice of records in other cases.  *See United States v. Wilson*, 631 F.2d 118, 119 (9th Cir.1980).

detainees are in close contact as they congregate in sally-ports[8] to move about the facility.

Greifinger Decl. at ¶ 13.  While using recreation area, attending immigration court, or seeking

medical care and medicine, detainees are again in close contact.  Ramirez-Alatorre Decl. at ¶ 9;

Espinoza Esparza Decl. at ¶¶ 3–6, Dkt. #25 (Augustine Decl.) at ¶ 5–7; Lopez Nuñez Decl. at

¶ 11; Dkt. #43 (Nerheim Decl.) at ¶ 14.  Even when detainees retire for the night, they are housed

tightly with other detainees, often in bunkbeds.  Jimenez-Espino Decl. at ¶ 5 (detainee indicating

that he sleeps on a bottom bunk, that the top bunk is 2-3 feet above him, that there are additional

beds 4-5 feet away from him, and that he sleeps in a room with 12 other detainees).  There

appears to have been little to no change to sleeping arrangements in response to COVID-19.

*Compare id.* at ¶ 3, *with* Lopez Gonzalez Decl. at ¶¶ 7–8; Lopez Nuñez Decl. at ¶¶ 5–6; *and*

Dawson Decl. at ¶ 3.  Put simply, the undisputed evidence establishes that maintaining social

distance at the NWIPC is impossible.  *See* Lopez Gonzalez Decl. at ¶ 4–5; Lopez Nuñez Decl. at

¶¶ 8–12; Dawson Decl. at ¶¶ 3–7 Petitioner Decl. at ¶ 6; Jimenez-Espino Decl. at ¶ 4.

### 6.    Cleaning

The close confines of the NWIPC make cleaning critically important.  The PBNDS set

forth environmental standards that GEO must meet for the NWIPC.  Bostock Decl. at ¶ 19

(PBNDS require GEO to develop and implement "policies, procedures and guidelines that are

intended to identify and eliminate or control as necessary . . . mode of transmission of agents or

vectors of communicable disease").  This includes, "[a]s a minimum of general housekeeping,"

damp dusting of horizontal surfaces with germicidal solution daily, daily cleaning of furniture

---

[8] Sally-ports are "a series of two locked gates that brings all staff and detained persons past a guard in a window control room."  Greifinger Decl. at ¶ 13.  Congregation in the sally-ports is particularly concerning because they are "a focal point for staff to transfer keys, radios, and other equipment through a hand to hand transaction, intensifying the risk of infection to staff members" and contamination of the area.  *Id.*

ORDER – 16

and fixtures, and daily mopping of all floors.  *Id.*  ICE's recent ERO PRR sets additional

expectations to combat COVID-19, including that GEO "ensure that surfaces and objects that are

frequently touched, especially those in common areas (e.g. doorknobs, light switches, sink

handles, countertops, toilets, recreation equipment) are cleaned and disinfected several times a

day."  Bostock Decl. at ¶ 20 (citing ERO PRR at 10).

    "In response to COVID-19, GEO has informed ICE that it has enhanced cleaning in all

housing units, food preparation and service area, intake rooms and other work centers with

increased emphasis on cleaning contact areas with disinfectant cleaners approved as effective

against COVID-19."  *Id.*  But, Respondents provide no further evidence or quantification of even

its basic cleaning protocols, let alone these additional efforts.  At best, Respondents indicate that

GEO has increased detainees' access to cleaning supplies and has been holding weekly town hall

meetings where detainees are instructed on how to clean tables and horizontal surfaces before

each meal, to disinfect the surfaces after each meal, and to clean countertops, microwave

handles, door handles, exercise equipment, electronic tablets, telephones, and any high-risk

contact areas with disinfectant cleaner.  Bostock Decl. at ¶ 22.

    Respondents present no evidence that professional cleaning occurs within the housing

units.  Indeed, GEO generally passes on the responsibility for maintaining the cleanliness of its

facilities to detainees, and GEO does not always assure that adequate cleaning is performed.

Espinoza Esparza Decl. at ¶ 13; Plutin Hernandez Decl. at ¶ 8; Lopez Gonzalez Decl. at ¶ 12;

Dawson Decl. at ¶ 10.  *But see* Bostock Decl. at ¶ 21 (indicating that Respondents searched for

detainee "complaints regarding lack of soap, sanitation or cleaning issues at the NWIPC" and did

not find any).

1    **7.    Personal Hygiene**

2          In addition to cleaning supplies, ICE obligates GEO to provide detainees "unlimited

3    access to supplies for hand cleansing, including liquid soap, running water, hand drying

4    machines or disposable paper towels, and no-touch trash receptacles." *Id.* at ¶¶ 20–21; Petitioner

5    Decl. at ¶ 6 (indicating that "[w]e wash our hands and do our best to maintain personal

6    hygiene").  As with cleaning supplies, GEO has informed ICE that it "has increased" access to

7    hygiene supplies and that it has been educating detainees during the weekly town hall meetings

8    on proper hand washing and covering coughs.  Bostock Decl. at ¶¶ 21–22.  But Respondents

9    provide no further evidence or quantification of these additional efforts and do not establish that

10   the guidance is enforced.

11         While detainees are provided adequate access to hand soap in the bathroom sinks, "the

12   faucets automatically shut off after a [number of seconds], making it nearly impossible to wash

13   one's hands for the recommended twenty seconds."  Greifinger Decl. at ¶ 15.  For this reason,

14   access to adequate washing facilities appears to be an ongoing issue.  *Compare* Jimenez-Espino

15   Decl. at ¶ 5 (describing rushed conditions when washing hands or brushing teeth at normal

16   times), *with* Espinoza Esparza Decl. at ¶ 6 *and* Lopez Gonzalez Decl. at ¶ 10.

17         Detainees are also dependent on the hygiene practices of the guards.  Most concerningly,

18   guards are not required to wear PPE.  Bostock Decl. at ¶ 29 ("GEO has informed ICE that it has

19   provided masks for use by its employees in areas outside the medical unit at the NWIPC on a

20   voluntary basis."); ERO PRR at 9 ("Cloth face covering should be worn by detainees and staff

21   (when PPE supply is limited) to help slow the spread of COVID-19.").  Evidence in the record

22   establishes that many guards do not always wear PPE when in contact with the detainees and

23   those that do generally do not change PPE when moving between pods.  *See* Bostock Decl. at

¶ 29; Trejo Flores Decl. at ¶ 6; Espinoza Esparza Decl. at ¶ 8; Lopez Gonzalez Decl. at ¶ 13–14; Augustine Decl. at ¶¶ 10–11.

### III.      DISCUSSION

#### A.      Article III Standing

Respondents argue that Petitioner does not have standing to bring this action.  Opp. at 13–16.  Article III standing has three elements: Petitioner "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, --- U.S. ---, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).  Petitioner bears the burden of establishing these elements, and when "a case is at the pleading stage, [Petitioner] must 'clearly . . . allege facts demonstrating' each element."  *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).  The standing inquiry is distinct from the merits of Petitioner's claims.  *See, e.g.*, *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (stating that the court's "threshold inquiry into standing 'in no way depends on the merits'" of the claim).

Respondents argue that Petitioner has not established an injury in fact or that the requested relief is likely to redress the injury.  As discussed below, neither argument is persuasive.

#### 1.      Injury in Fact

To establish an injury in fact, Petitioner must show that he "suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical."  *Friends of the Earth, Inc.*, 528 U.S. at 181, (quoting *Lujan*, 504 U.S. at 560); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  Petitioner must

ORDER – 19

show that the injury is "certainly impending" or "there is a substantial risk that the harm will

occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks

omitted). "A future injury need not be 'literally certain,' but there must be a 'substantial risk'

that it will occur." *Nw. Requirements Utils. v. F.E.R.C.*, 798 F.3d 796, 805 (9th Cir. 2015)

(quoting *Clapper*, 568 U.S. at 432). "[T]he question becomes whether any perceived threat . . .

is sufficiently real and immediate to show an existing controversy." *O'Shea v. Littleton*, 414

U.S. 488, 496 (1974).

Respondents argue that Petitioner has not established an injury in fact because his claim

of future injury from COVID-19 is merely hypothetical. Opp. at 14–16. The Court disagrees.

Petitioner alleges that he is at high risk of severe illness or death if he contracts COVID-19. Am.

Pet. at ¶ 67. He alleges that public health experts have concluded it is "nearly inevitable" that

COVID-19 will enter the NWIPC despite the steps Respondents have taken. *Id.* at ¶ 39; *see also

id.* at ¶¶ 35–52. He further alleges that public health experts believe social distancing and

hygiene measures are the only defense against the virus, but that he is unable to adequately

follow this advice at the NWIPC. *Id.* at ¶ 68; *see also id.* at ¶¶ 35–52. Courts have recognized

that unsafe conditions in a prison or detention center in and of themselves constitute a concrete

injury, even if further resulting harm has not yet occurred. *See, e.g.*, *Helling v. McKinney*, 509

U.S. 25, 33 (1993) (observing that "it would be odd to deny an injunction to inmates who plainly

proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had

happened to them"); *Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir. 1985) (holding that

prisoners "have the right not to be subjected to the unreasonable threat of injury or death by fire

and need not wait until actual casualties occur in order to obtain relief from such conditions,"

and explaining that "[f]ailure to provide adequate cell cleaning supplies, under circumstances

such as these, deprives inmates of tools necessary to maintain minimally sanitary cells, seriously

threatens their health, and amounts to a violation of the Eighth Amendment.").  Because

Petitioner alleges unsafe conditions at the NWIPC, the Court concludes that he establishes an

injury in fact.

### 2.      Redressability

To establish redressability, Petitioner must allege that the relief he seeks is "substantially

likely" to redress his injuries and that the Court has the power to grant the relief.  *Juliana v.*

*United States*, 947 F.3d 1159, 1170 (9th Cir. 2020).  "Redress need not be guaranteed, but it

must be more than merely speculative."  *Id.* (internal quotation marks omitted).  Respondents

argue that Petitioner's requested remedy—release—would not ameliorate his risk of injury from

COVID-19 because such an order would not prevent him from contracting the virus.  Opp. at 15.

They also argue that "Petitioner does not explain how release from the NWIPC, a facility without

a single confirmed case of COVID-19, into Utah where the COVID-19 outbreak has begun

spreading throughout the state, will reduce his risk of injury."  *Id.* at 16.  As one court recently

concluded, "this argument strains credulity."  *Coreas v. Bounds*, No. 20-780, 2020 WL 1663133,

at *6 (D. Md. Apr. 3, 2020).  "Beyond the absurdity of the claim that someone will be safer from

a contagious disease while confined in close quarters with dozens of other detainees and staff

than while at liberty," *id.*, Petitioner has alleged that multiple experts have recommended the

release of vulnerable individuals from detention in response to the COVID-19 pandemic, *see*

Am. Pet. at ¶¶ 29–32.  Accordingly, the Court concludes that Petitioner has sufficiently

established the redressability requirement of standing.

ORDER – 21

**B.      Jurisdiction Under 28 U.S.C. § 2241**

Respondents argue that Petitioner may not challenge the conditions of his confinement through a habeas petition and must instead bring a civil rights action seeking a judicially mandated change in conditions or an award of damages, rather than release from detention.  Opp. at 16.  The Ninth Circuit, however, expressly held that this Court could adjudicate Petitioner's request for release under § 2241 when it transferred his emergency motion to this Court as a habeas petition.  Dkt. #1-1.  Accordingly, Respondents' argument fails.  *See also Dawson v. Asher*, No. C20-409JLR, 2020 WL 1704323, at *8 – *9 (W.D. Wash. Apr. 8, 2020).

**C.      Legal Standards for a TRO**

The standard for issuing a TRO is the same as the standard for issuing a preliminary injunction.  *See New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1347 n.2 (1977).  A TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  "The proper legal standard for preliminary injunctive relief requires a party to demonstrate (1) 'that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest.'"  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (citing *Winter*, 555 U.S. at 20).

As an alternative to this test, a preliminary injunction is appropriate if "serious questions going to the merits were raised and the balance of the hardships tips sharply" in the moving party's favor, thereby allowing preservation of the status quo when complex legal questions require further inspection or deliberation.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011).  However, the "serious questions" approach supports a court's entry of

ORDER – 22

a TRO only so long as the moving party also shows that there is a likelihood of irreparable injury

and that the injunction is in the public interest.  *Id.* at 1135.  The moving party bears the burden

of persuasion and must make a clear showing that he is entitled to such relief.  *Winter*, 555 U.S.

at 22.

**D.     Likelihood of Success on the Merits**

Petitioner argues that his continued detention in conditions that present an unreasonable

risk of serious illness or death violate his Fifth Amendment substantive due process rights to

reasonably safe conditions of confinement and to conditions not amounting to punishment.[9]  The

Court discusses each argument below and concludes that Petitioner has established a likelihood

of success on the merits of his claims.[10]

**1.     Reasonable Safety**

"[W]hen the State takes a person into its custody and holds him there against his will, the

Constitution imposes upon it a corresponding duty to assume some responsibility for his safety

and general well-being."  *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–

200 (1989).[11]  The government thus violates the Due Process Clause if it fails to provide civil

detainees with "food, clothing, shelter, medical care, and reasonable safety."  *Id.* at 200.  The

---

[9] Petitioner is protected by the Fifth Amendment because he is a federal civil detainee.  *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

[10] The Court recognizes that two recent decisions from this District have reached the opposite conclusion in cases involving vulnerable detainees.  *See Dawson*, 2020 WL 1704324; *Almeida v. Barr*, No. C20-490RSM, Dkt. 11 (W.D. Wash. Apr. 6, 2020). Additional facts in the record of this case warrant a different conclusion.

[11] In *DeShaney*, the Supreme Court analyzed the petitioners' rights under the Fourteenth Amendment.  *See* 489 U.S. at 194–95.  Fifth Amendment due process claims and Fourteenth Amendment due process claims are analyzed in the same way.  *See Paul v. Davis*, 424 U.S. 693, 702 n.3 (1976).

ORDER – 23

Ninth Circuit has analyzed such conditions of confinement claims under an objective deliberate indifference standard.  *See Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc) (adopting objective deliberate indifference standard based on *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466 (2015), to evaluate failure to protect claim brought by pretrial detainee); *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) (applying *Castro*'s objective deliberate indifference test to pretrial detainee's claim that jail violated right to adequate medical care); *Smith v. Washington*, 781 Fed. Appx. 595, 597 (9th Cir. 2019) (holding that *Castro*'s objective deliberate indifference test applied to civil detainees' conditions of confinement claim alleging that state officials violated their constitutional rights by exposing them to environmental tobacco smoke); *see also Habibi v. Barr*, No. 20-618, 2020 WL 1864642, at *3 – *4 (S.D. Cal. Apr. 14, 2020) (applying *Castro*'s objective deliberate indifference standard to the petitioner's reasonable safety claim based on COVID-19).  The elements of such a claim are:

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
>
> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
>
> (4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Castro*, 833 F.3d at 1071.  The Court analyzes each factor below.

### a.    Intentional Decision

To date 317 detainees at ICE detention facilities and 116 ICE employees have confirmed cases of COVID-19.  As part of its response, ICE has developed the ERO PRR to aid its detention facilities in addressing the risks of the virus.  ICE is wholly aware of the serious risks

ORDER – 24

posed by COVID-19, particularly for those at high risk for serious illness or death.  Nevertheless,

Respondents continue to house detainees in settings where they cannot engage in meaningful

social distancing.  Respondents have failed to implement and enforce cleaning and hygiene

measures to prevent the spread of COVID-19 and do not even require all employees to wear PPE

when interacting with detainees.  Respondents are also aware that Petitioner's age and medical

history place him at high risk for serious infection or death, *see* Bostock Decl. at ¶ 50, yet they

have chosen not to take any added measures to address Petitioner's heightened risk.

Respondents have acted intentionally.  *See Castro*, 833 F.3d at 1070 (a failure to act with respect

to a known condition of confinement may constitute an intentional decision).

### b.  Substantial Risk of Serious Harm

Petitioner has presented uncontested evidence that he is at a higher risk of complications

from COVID-19 due to his age and medical history.  *See* Greifinger Decl. at ¶ 34 (medical

history); Bostock Decl. at ¶ 50 (age).  According to Petitioner's experts, there is about a 15%

fatality rate among the highest risk populations who have contracted COVID-19, and high-risk

individuals who do not die from COVID-19 are expected to require a prolonged recovery to

rehabilitate from profound deconditioning, loss of digits, neurologic damage, and loss of

respiratory capacity.  Golob Decl. at ¶ 4.  Furthermore, most people in the higher risk categories

will require more advanced support, including positive pressure ventilation and, in extreme

cases, extracorporeal mechanical oxygenation.  Id. at ¶ 8.  Should Petitioner contract COVID-19,

serious harm is likely.

Nevertheless, Respondents detain Petitioner at the NWIPC in conditions that create a

substantial risk he will be exposed to the coronavirus and contract COVID-19.  Petitioner has

presented expert opinion evidence that the threat of COVID-19 at the NWIPC is "imminent."

Greifinger Decl. at ¶ 27; *see also id.* at ¶¶ 11–12 (noting that "ICE will not be able to stop the spread of COVID-19 within its facilities" and that "ICE is not set up to be able to contain the disease once it is inside of its facilities"); *id.* at ¶ 5 (noting that even if "conditions inside the facility were impeccable," release would remain the "most important means of mitigating the spread of COVID-19" within the facility).

The biggest threat comes from Respondents' inability to identify asymptomatic carriers as staff, contractors, vendors, attorneys, and visitors come and go between the detention center and the broader community where COVID-19 has been spreading.[12]  Golob Decl. at ¶ 6; *see also* ERO PRR at 11 (recognizing that "[b]ecause many individuals infected with COVID-19 do not display symptoms, the virus could be present in facilities before cases are identified"). Petitioner's expert opines—without dispute from Respondents—that "there is little to no ability to adequately screen [] for new, asymptomatic infection."  Greifinger Decl. at ¶ 8.  This threat is also posed by new detainees brought to the NWIPC.  Respondents take important steps in monitoring active symptoms and housing new detainees together for a 14-day observation period.[13]  "To limit the spread of the virus, however, ICE policy must also recognize the significance of the spread of COVID-19 from asymptomatic individuals."  *Id.* at ¶ 19. Respondents' current procedures do not adequately respond to this threat.

---

[12] The NWIPC is in Pierce County, Washington, where there have been over 1,200 confirmed cases of COVID-19.  Wash. DOH, 2019 Novel Coronavirus Outbreak (COVID-19), https://www.doh.wa.gov/Emergencies/Coronavirus (last visited Apr. 26, 2020).

[13] Petitioner does, however, present evidence raising questions as to whether Respondents always follow their protocol for new detainees.  *See* Jimenez-Espino Decl. at ¶ 7 (detainee indicating that "new detainees continued to arrive [to his housing unit] without quarantine"); Espinoza Esparza Decl. at ¶9 (similar).

Petitioner has also presented evidence that once introduced to the NWIPC, COVID-19 is likely to "spread[] like wildfire."  Greifinger Decl. at ¶ 27.[14]  Staff may again be the most obvious vector, especially as GEO staff are not required to wear PPE as they interact with detainees.  Bostock Decl. at ¶ 29 ("GEO has informed ICE that it has provided masks for use by its employees in areas outside the medical unit at the NWIPC on a voluntary basis.").  ICE's ERO PRR now sets the expectation that "[c]loth face coverings should be worn by detainees and staff (when PPE supply is limited) to help slow the spread of COVID-19."  ERO PRR at 9.[15]  But Petitioner has presented evidence that guards regularly do not wear PPE or maintain social distance when interacting with each other and detainees.  Trejo Flores Decl. at ¶ 6 (April 15, 2020 declaration indicating that only after outside protests have "officers started wearing masks when they [are] outside the facility" but that "the officers are not wearing masks inside the building when they are with the detainees like me"); *see also* Nerheim Decl. at ¶¶ 5–6, 9 (detailing instances of GEO staff taking a cavalier and contemptuous approach to safety precautions, including violations of safe distancing recommendations, refusing to wear PPE, and harassing behavior); Augustine Decl. at ¶¶ 3–4, 10–11 (noting lax enforcement of procedures and failure to wear PPE).

---

[14] The Court notes that this conclusion is entirely consistent with available data.  As of April 18, 2020, ICE indicated that 72 detainees had confirmed cases of COVID-19 across 23 facilities. Dkt. #38-1 at 2.  At present, ICE indicates that 317 detainees now have confirmed cases of COVID-19 across 30 facilities.  ICE Guidance on COVID-19, Confirmed Cases, https://www.ice.gov/coronavirus (last visited Apr. 27, 2020).

[15] There is evidence that detainees were provided masks on April 18, 2020, but that they had not been provided with any PPE or cloth face coverings prior to this date. *Compare* Jimenez-Espino Decl. at ¶ 5 (April 15, 2020 declaration that detainees "have not been provided with any [type] of mask or other protective gear.") *and* Nerheim Decl. at ¶¶ 14, 15 (attorney indicating that "[n]o one in the hallway on the day of my hearings on March 25, 2020 was wearing a mask, other than me" and that a client's request for a mask approximately two weeks ago was denied), *with* Nerheim Decl. at ¶ 15 ("just this past Saturday, April 18, 2020, detainees were given masks").

ORDER – 27

Additionally, Petitioner demonstrates that spread is likely on his evidence of frequent cross-contact between detainees in different housing units.  This includes when detainees attend immigration court and visit the medical clinic, both of which are housed within the facility, and when they perform jobs within the detention center.  *See* Nerheim Decl. at ¶ 14 (describing conditions in the immigration court); Augustine Decl. at ¶¶ 5–7 (same); Trejo Flores Decl. at ¶ 7 (describing work doing laundry with detainees from different housing units); Ramirez-Alatorre Decl. at ¶ 9 (describing his April 17, 2020 visit to the medical clinic where eight detainees, none of whom were wearing PPE or cloth masks, were forced to stand less than two feet apart while they waited for their appointments); *but see* Malakhova Decl. at ¶¶ 1–4 (attesting on April 3, 2020, that detainees in the medical clinic are able to maintain at least six feet of distance between each other).

When detainees return to their housing units, they are unable to adequately prevent the spread of the virus.  Every possible information source, including those that Respondents create and circulate, indicate that hygiene *and* social distancing are critical to avoiding the spread of infection.  *See, e.g.*, Golob Decl. at ¶ 10 ("Social distancing . . . *and* hygiene, including washing with soap and water are the only known effective measures for protecting vulnerable communities from COVID-19.") (emphasis added); ERO PRR at 11 ("Both good hygiene practices and social distancing are critical in preventing further transmission.").

Yet there are deficiencies with respect to both.  First, Petitioner has presented evidence that Respondents continue to house NWIPC detainees in conditions that make it practically impossible to maintain adequate social distancing throughout the day.  In fact, Respondents do not even attempt to argue that social distancing is a realistic possibility at the NWIPC.  Second, detainees, not professionally trained cleaners, are responsible for cleaning and disinfecting the

housing units, and it is unclear how they have been trained and whether there are adequate

cleaning and disinfecting standards that are being meaningfully enforced.  Furthermore, because

detainees live in high population units, there is a high demand for the shared resources, like the

tables, phones, tablets, sinks, toilets, showers, and food preparation areas, which decreases the

ability of detainees to maintain adequate hygiene.  Although  there appear to have been some

positive changes with respect to cleaning and hygiene, *see* Jimenez-Espino Decl. at ¶ 5

(indicating that detainees "have soap, and a liquid cleaner that is used to clean the tables, but []

don't have any hand sanitizer"), the changes have not been adequate to reduce the risk to

Petitioner and other high risk detainees.

Given the evidence that Respondents are unlikely to prevent the introduction of COVID-19 to the NWIPC and the evidence that the virus is likely to spread quickly throughout the facility, the Court concludes Petitioner has made a clear showing that he faces a substantial risk of serious harm due to the conditions of his present confinement and the fact that he is at higher risk for serious illness or death from COVID-19.

The fact that there have been no confirmed cases at the NWIPC does not warrant a different conclusion.  Since COVID-19 was first announced in Washington State in January 2020, there consistently have been well over 700 detainees housed at the detention center.  *See* Bostock Decl. at ¶ 6 (874 detainees on March 2, 2020; 792 detainees on April 1, 2020; 747 detainees on April 15, 2020).  As of April 3, 2020, only three detainees had been tested.[16] Malakhova Decl. at ¶ 7.  Respondents have not presented any evidence of additional testing

---

[16] Also, as of April 3, 2020, no IHSC employees had reporting being tested.  Malakhova Decl. at ¶ 8.  Respondents have not provided the Court with any information regarding how many ICE ERO or GEO employees have been tested; they have only reported that none have tested positive.  *See* Bostick Decl. at ¶ 30.

since.  Petitioner, on the other hand, has presented expert opinion testimony that "[w]hen a community or institution lacks a comprehensive and rigorous testing regime, a lack of proven cases of COVID-19 is functionally meaningless for determining if there is a risk for COVID-19 transmission in a community or institution."  Golob Decl. at ¶ 7.  Such is the case here.  Three tests for a population of over 700 detainees over the course of three months since COVID-19 was first detected in Washington State provides no reassurance to the Court that COVID-19 is not already present at the NWIPC.  *See* Greifinger Decl. at ¶ 18 (medical expert noting that obvious result of inadequate testing capacity is that "[m]any more people have been infected with COVID-19 than have been confirmed").

Indeed, Petitioner has submitted declarations from several detainees who have indicated that they have been housed with others exhibiting apparent symptoms of COVID-19 or have themselves been experiencing symptoms but have been denied testing for COVID-19.  For example, Javier Jimenez-Espino attested on April 15, 2020, that for the past three days he had been sick with chills, fever, shaking, and a sore throat; when he went to the medical clinic, he was diagnosed with a cold and told that "they only test those who are very, very ill" for COVID-19.  Jimenez-Espino Decl. at ¶¶ 8–10; *see id.* at ¶ 10 ("I am not the only one with many symptoms who is being refused a test.").  Rene Ruben Ramirez-Alatorre, who has underlying medical issues including asthma, attests that he has been experiencing "diarrhea, fever, headaches, and sore throat," as well as chest pain and difficulty breathing, and that when he went to the medical clinic on April 17, 2020, they treated him for asthma but refused his request for a COVID-19 test.  Ramirez-Alatorre Decl. at ¶¶ 7–12.  Mr. Ramirez-Alatorre further attests that there are five other detainees in his housing unit who are experiencing symptoms consistent with COVID-19 but have not been tested.  *Id.* at ¶¶ 10–11.  When Elmer Trejo Flores, who has high

ORDER – 30

blood pressure and a heart murmur, had a cough, nasal congestion, and headaches and went to

the medical clinic on April 19, 2020, a staff member told him that he needed to also have a fever

in order to be tested for COVID-19.   Trejo Flores Decl. at ¶¶ 3–5.   He further attests that

approximately three others in his housing unit are sick and coughing, and none of them have

been separated from the group.   *Id.* at ¶ 4.   While it is not the Court's role to make medical

determinations, this evidence is concerning, to say the least.[17]

On the current record, the Court concludes Petitioner has made a clear showing that he is

likely to succeed on his claim that the conditions of his detention place him at substantial risk of

suffering serious harm.

### c.        Objective Unreasonableness or Reckless Disregard

Petitioner must establish a likelihood that Respondents failed to take reasonable available

measures to abate the risk such that their conduct was objectively unreasonable.  *Castro*, 833

F.3d at 1071.  With respect to this element, the government's conduct must be "objectively

unreasonable, a test that will necessarily 'turn on the facts and circumstances of each particular

case.'"  *Id.* (quoting *Kingsley*, 135 S. Ct. at 2473) (alterations and internal quotation marks

omitted).  Objective unreasonableness requires "more than negligence but less than subjective

intent—something akin to reckless disregard."  *Id.* (quoted source omitted).

As summarized above, Respondents have taken numerous actions in response to the

COVID-19 outbreak.  *See also Dawson*, 2020 WL 1704324, at *4 – *7, *11 – *12 (concluding

---

[17] According to the Washington State DOH, patients with COVID-19 symptoms who live or
work in an institutional or congregate setting, including correctional facilities, "should be
tested."  Wash. DOH, COVID-19 Testing Information for Healthcare Providers (Apr. 6, 2020),
*available at https://www.doh.wa.gov/Portals/1/Documents/1600/coronavirus/Interim-
2019NovelCoronavirusQuicksheetProviders.pdf.*

ORDER – 31

that ICE was taking "substantial measures" to prevent an outbreak of COVID-19 at the NWIPC

and to contain an outbreak should one occur).  There are, however, several glaring deficiencies.

First, ICE has not reduced or rearranged the population at the NWIPC such that

appropriate and meaningful social distancing is possible.  As of April 18, 2020, 13,287 of the

30,737 individuals held in ICE custody nation-wide had no criminal convictions and no criminal

charges pending against them.  ICE, Detention Management, *available at*

https://www.ice.gov/detention-management (last visited on Apr. 22, 2020).  Given the risks

posed by the COVID-19 pandemic, it would be reasonable for ICE to exercise its discretion to

release a significant number of these noncitizens to create safer conditions for those who remain

in detention.  ICE has failed to do so.

Second, Respondents have not established social distancing protocols outside of the

medical clinic.[18]  "Social distancing[—]remaining physically separated from known or

potentially infected individuals[—]and hygiene, including washing with soap and water are the

only known effective measures for protecting vulnerable communities from COVID-19."  Golob

Decl. at ¶ 10; Greifinger Decl. at ¶ 10; ERO PRR 11 ("Both good hygiene practices and social

distancing are critical in preventing further transmission.").  The CDC recommends that

detention facilities stagger mealtimes and times in recreation spaces, increase space between

people who are in holding cells or in line, and space out beds to allow six feet between detainees.

CDC, Facts for Correctional and Detention Facilities (updated Apr. 10, 2020),

https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/faq.html (last

visited Apr. 23, 2020).  The unrefuted evidence from detainees is that social distancing is not

---

[18] As noted previously, the record indicates that the medical clinic does not always enforce social distancing for detainees who are waiting to be seen by a provider.  Ramirez-Alatorre Decl. at ¶ 9.

possible during meal times where detainees sit side-by-side, at times while visiting the medical clinic, while waiting for immigration court when detainees are seated right next to each other, and while sleeping.  Jimenez-Espino Decl. at ¶¶ 3–5; Petitioner Decl. at ¶ 6; Ramirez-Alatorre Decl. at ¶ 9; Espinoza Esparza Decl. at ¶¶ 3–6, Augustine Decl. at ¶ 5; Lopez Nuñez Decl. at ¶ 11.  While perhaps not all these measures are possible given the current number of detainees, Respondents have not provided reasons why they could not implement a majority, or even some, of these recommendations.[19]

Third, Respondents have not taken any steps to protect Petitioner, who they know is a high-risk individual.  Beyond identification, the ERO PRR does not establish extra precautions for high risk individuals unless they are suspected of infection.  Respondents do not present any evidence that they are taking any added precautions to abate the elevated harm faced by Petitioner.  *See Coreas*, 2020 WL 1663133, at *11 (noting high-risk detainee's need for "separation from, or at least minimization of contact with other detainees" and noting failure "to meet this medical need for distancing, whether by providing [detainee] his own cell" or by distancing him by other means); *Fraihat v. U.S. Immigration & Customs Enforcement*, --- F. Supp. 3d ---, 2020 WL 1932570, *7 (C.D. Cal. Apr. 20, 2020) (noting that "medically vulnerable

---

[19] Again, the lack of social distancing increases the need for regular professional cleaning.  It is not enough for ICE to say that GEO is obligated to ensure clean facilities and for GEO to say that it makes it possible for detainees to maintain clean facilities.  The obligation in the first instance rests with ICE.  The record provides no indication that ICE has attempted to verify GEO's claims of increased cleaning or has considered any of its, no doubt robust, contractual remedies.  The simple fact is that housing civil detainees may be a more expensive prospect during a global pandemic.  But that does not relieve Respondents of their constitutional obligations.

individuals who are mandatorily detained will not be identified, or offered any accommodation

beyond that available to the general population to protect from" COVID-19).[20]

Fourth, Respondents have implemented screening procedures for people entering the

facility but have only tested three detainees for COVID-19.  As discussed above, given this

limited testing, a lack of proven cases cannot establish that COVID-19 is not already present at

the NWIPC, particularly when coupled with the reports from detainees who attest they are

experiencing symptoms consistent with COVID-19 but have been denied tests.  According to the

Washington State Department of Health ("DOH"), healthcare providers "may test any patient

with symptoms consistent with COVID-19 (e.g., fever, cough, shortness of breath)."  Wash.

DOH, COVID-19 Testing Information for Healthcare Providers (Apr. 6, 2020), *available at*

*https://www.doh.wa.gov/Portals/1/Documents/1600/coronavirus/Interim-*

---

[20] The Court notes further that it does not appear that Respondents have individually considered Petitioner for possible relief on the basis that he is subject to mandatory detention.  Respondents indicate only that "ICE has conducted a custody reassessment review, of Petitioner's case in light of his age . . . but has determined that he is not a *candidate* for release."  Bostock Decl. at ¶ 50. Respondents do not make clear which review processes Petitioner was a part of and reference only the initial March review.  *See id.* (referencing first review where ICE identified 550 detainees as over the age of 60 or pregnant and confusingly indicating that "[o]f this population, ICE identified nearly 700 individuals for release after evaluating their medical history, immigration history, criminal history, potential threat to public safety, flight risk, and national security concerns").

Respondent does not clarify whether Petitioner was afforded further individual consideration in either of the next two reviews, and the Court is left to conclude that he was not.  In *Dawson*, Officer Bostock declared on March 30, 2020, that "[e]arly last week, ERO Tacoma began conducting discretionary review of certain detainees' cases identified by IHSC" as high-risk. *Dawson v. Asher*, Case No. C20-409JLR, Dkt. #66 at ¶ 31 (W.D. Wash. March 30, 2020).  This appears to clearly refer to the March 20 review.  But in *Dawson*, Officer Bostock further clarified that individual detainees were only given a "case-by-case analysis" if they were "not subject to mandatory custody."  *Id.*; *see also Fraihat*, 2020 WL 1932570 at *7 (indicating "ICE's current policy does not allow the exercise of discretion to release those subject to mandatory detention"). Here, Officer Bostock is clear: "Petitioner is subject to mandatory detention . . . due to his criminal convictions."  Bostock Decl. at ¶ 46.

ORDER – 34

*2019NovelCoronavirusQuicksheetProviders.pdf*.  In fact, the DOH asks providers to prioritize

testing for certain patients, including those with COVID-19 symptoms who live or work in an

institutional or congregate setting, such as the NWIPC.  *Id.*  According to the DOH, such

patients, "should be tested."  *Id.*  Therefore, there does not appear to be an outside barrier

preventing Respondents from testing more broadly, and Respondents do not point to any.

Given these deficiencies, the Court concludes Petitioner has established a likelihood that

Respondents have acted with reckless disregard to the significant risk of serious harm to

Petitioner.

### d.    Causation

Courts have recognized that unsafe prison conditions that create a risk of future injury are

sufficient to sustain a constitutional violation without an additional showing of harm.  *See, e.g.*,

*Helling*, 509 U.S. at 33 (recognizing that prison authorities may not "ignore a condition of

confinement that is sure or very likely to cause serious illness and needless suffering the next

week or month or year," and noting that prison officials could not escape liability for exposing

inmates to a serious, communicable disease on the ground that the complaining inmate showed

no serious current symptoms); *Hutto v. Finney*, 437 U.S. 678, 682 (1978) (finding an Eighth

Amendment[21] violation where inmates were exposed to infectious maladies such as hepatitis and

---

[21] The constitutional rights of criminal detainees establish a floor, and not a ceiling, for the
clearly established constitutional rights of civil detainees.  *See Smith*, 781 F. App'x. at 597.  Due
process protections for civil detainees are at least as robust as those of the Eighth Amendment
because "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions,
it must be unconstitutional to confine the involuntarily committed—who may not be punished at
all—in unsafe conditions."  *Youngberg v. Romeo*, 457 U.S. 307, 315–16 (1982).  *Cf. Bell v.
Wolfish*, 441 U.S. 520, 545 (1979) (holding that pretrial detainees "retain at least those
constitutional rights that we have held are enjoyed by convicted prisoners").  Thus, individuals
held in civil detention "are entitled to more considerate treatment and conditions of confinement
than criminals whose conditions of confinement are designed to punish."  *Youngberg*, 457 U.S.
at 321–22 (addressing persons subjected to involuntary civil commitment for mental health

venereal disease even though inmates did not allege the likely harm would occur immediately or

that all inmates exposed would be infected); *Hoptowit*, 753 F.3d at 784 (finding an Eighth

Amendment violation due to substandard fire prevention at penitentiary and reasoning that

"[p]risoners have the right not to be subjected to the unreasonable threat of injury or death by fire

and need not wait until actual casualties occur in order to obtain relief from such conditions.").

Because Petitioner has established a likelihood that the current conditions under which

Respondents detain him place him at substantial risk of serious harm, the Court concludes, based

on this authority, that Petitioner has satisfied the final element of the objective deliberate

indifference test.

In sum, the Court concludes that Petitioner has made a clear showing that he is likely to

prevail on his claim that Respondents have failed to provide him with reasonably safe conditions

of confinement in violation of his Fifth Amendment due process rights.

### 2. Punitive Conditions of Confinement

Conditions of confinement violate a civil detainee's Fifth Amendment due process rights

when the conditions "amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535

(1979); *see also Kingsley*, 135 S. Ct. at 2473–74. A petitioner can demonstrate punitive

conditions by showing that the challenged condition is: (1) expressly intended to punish or (2)

not rationally related to a legitimate government objective or is excessive to that purpose. *Id.*;

*see also Jones v. Blanas*, 393 F.3d 918, 933–34 (9th Cir. 2004) (holding that conditions are

punitive where they are "employed to achieve objectives that could be accomplished in so many

alternative and less harsh methods"). Petitioner raises only the second test, arguing that the risk

---

reasons). *Cf. Bell*, 441 U.S. at 536–37 (holding that pretrial detainees may be held in custody "so

long as those conditions and restrictions [of confinement] do not amount to punishment").

ORDER – 36

he faces of serious illness or death from COVID-19 is not reasonably related to or is excessive in relation to a legitimate governmental interest.  Mot. at 17.

The Supreme Court has recognized that detention pending removal proceedings is rationally related to the legitimate governmental interest of ensuring noncitizens appear for their removal proceedings and preventing danger to the community.  *See Jennings v. Rodriguez*, --- U.S. ---, 138 S. Ct. 830, 836 (2018); *Demore v. Kim*, 538 U.S. 510, 520–22 (2003); *Zadvydas v. Davis*, 533 U.S. at 690–91.  Petitioner does not dispute that these are legitimate governmental interests; however, he argues that continued detention ceases to be reasonably related to these objectives when it threatens imminent illness and death.  Mot. at 18.  Respondents counter that the COVID-19 outbreak does not alter the conclusion that Petitioner's detention is rationally related to the government's non-punitive responsibilities and administrative purposes.  Opp. at 19.

Petitioner has been a lawful permanent resident of the United States for over 20 years. He was convicted in 2013 of a serious, nonviolent drug-related crime.  He served his criminal sentence and in fact was released early because of his behavior.  Petitioner is being held only to face a civil violation, placing him in a materially different position than those who are being held to answer criminal charges.  Although Petitioner's initial detention could not be described as punitive, the situation has drastically changed given the unique and unprecedented threat posed by COVID-19.  As discussed above, Petitioner has established a likelihood that he is being held in conditions that create a substantial risk of serious and potentially permanent, irreparable harm due to his age and underlying health conditions.  These conditions create far more serious

consequences for Petitioner than are justified by Respondent's need to ensure his presence at removal, should that be the ultimate outcome of his proceedings.[22]

Likewise, the risk to Petitioner of continued detention is excessive in relation to Respondent's need to protect the community.  Petitioner has been convicted of only one crime in the last 66 years, and although it was serious, he successfully completed his prison sentence, was released early to a halfway house, and then began home confinement—all without incident. Under these circumstances, the Court concludes that Petitioner has established a likelihood that the conditions of his detention are not reasonably related to the legitimate governmental interests such that his continued detention is punitive in violation of his due process rights.

**E.     Irreparable Harm**

To satisfy the second *Winter* prong, Petitioner must make a clear showing that "irreparable harm is likely in the absence of an injunction."  *Winter*, 555 U.S. at 22.  As discussed above, Petitioner has established a likelihood of success on the merits of his due process claims.  "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  Therefore, Petitioner has established that irreparable injury is likely.

**F.     Balance of Equities and Public Interest**

When the government is a party, the balance of equities and public interest factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  To determine the balance of equities, the Court must "balance the

---

[22] The Court further notes that Petitioner has specific plans to return to live with his son, daughter-in-law, and grandchildren in Salt Lake City, where he has done well previously.  Y. Pimental Decl. at ¶¶ 9–10.

ORDER – 38

interests of all parties and weigh the damage to each." *Stormans, Inc.*, 586 F.3d at 1138 (citation omitted). Petitioner has a constitutional interest in his health and safety, and as discussed above, he faces a substantial risk of serious harm while he remains detained at the NWIPC. Respondents have an interest in the execution of the immigration laws, but any damage resulting from Petitioner's release would be minimal in comparison. *See Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (the government "cannot suffer harm from an injunction that merely ends an unlawful practice . . ." (citing *Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983)) (INS cannot assert harm in any legal sense by being enjoined from constitutional violations)). The equities clearly favor Petitioner.

With respect to the public interest, the Ninth Circuit has indicated that "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (quoted source omitted). Furthermore, releasing Petitioner on reasonable conditions would not be counter to the public interest. Respondents correctly point out that the public interest favors the prompt execution of removal orders. Opp. at 23 (citing *Nken*, 556 U.S. at 435 ("There is always a public interest in prompt execution of removal orders.")). But the record does not reflect that Petitioner would fail to present himself for removal. To the extent Respondents have concerns about Petitioner being a flight risk, there are reasonable conditions of supervision that could address those concerns. Furthermore, although Petitioner has a criminal history, he has paid his debt to society and successfully completed the end of his sentence at a halfway house and then on home confinement. His continued detention increases the risk to himself, other detainees held at the NWIPC, the staff of the NWIPC, and the public at large. *See* Greifinger Decl. at ¶¶ 5 (releasing detainees benefits the general public), *id.* at ¶ 35 (releasing detainees

1    reduces burden on regional hospitals and health centers); Stern Decl. at ¶ 10 (similar).  On

2    balance, the public interest strongly favors Petitioner.

3         Petitioner has made a clear showing of the final *Winter* factors.

4    **G.    Remedy**

5         Petitioner has made a clear showing as to each of the *Winter* factors, and therefore he is

6    entitled to a TRO to remedy the likely constitutional violations.  Petitioner maintains that the

7    only effective remedy is release.  Mot. at 3, 10–12, 21–23; *Prieser v. Rodriguez*, 411 U.S. 475,

8    494 (1973).  Respondents contend the Court should not release Petitioner because: (1) he is

9    subject to mandatory detention under 8 U.S.C. § 1226(c); (2) release is not the appropriate

10   remedy for unconstitutional conditions of confinement, citing *Crawford v. Bell*, 599 F.2d 890

11   (9th Cir. 1979); and (3) Petitioner cannot show he is entitled to immediate release as opposed to

12   injunctive relief that would leave him detained while ameliorating the alleged unconstitutional

13   conditions within the facility.  Opp. at 17–18, 20–21.  The Court is not persuaded by

14   Respondents' arguments.

15        Regardless of the statutory basis for Petitioner's detention, the Court has the authority to

16   order his release if his continued detention violates the Constitution.  *See Swann v. Charlotte-*

17   *Mecklenburg Bd. Of Educ.*, 402 U.S. 1, 15–16 (1971) ("Once a right and a violation have been

18   shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for

19   breadth and flexibility are inherent in equitable remedies."); *Stone v. City & Cnty. of San*

20   *Francisco*, 968 F.2d 850, 861 (9th Cir. 1992) ("Federal courts possess whatever powers are

21   necessary to remedy constitutional violations because they are charged with protecting these

22   rights."); *Malam v. Adducci*, --- F. Supp. 3d ---, 2020 WL 1672662, at *1 – *2 (E.D. Mich. Apr.

23   6, 2020) (ordering release of individual detained under 8 U.S.C. § 1226(c)); *Vasquez Barrera v.*

*Wolf*, No. C20-1241, 2020 WL 1904497, at *1 (S.D. Tex. Apr. 17, 2020) (same).  "The Court

exceeds [its] discretion only if the injunctive relief is aimed at eliminating a condition that does

not violate the Constitution or does not flow from such a violation."  *Melendres v. Maricopa

Cnty.*, 897 F.3d 1217, 1221 (9th Cir. 2018) (quotation marks and citations omitted).

The Court finds Respondents' reliance on *Crawford* to be misplaced.  *Crawford* involved

a convicted federal prisoner, not a civil immigration detainee.

As to Respondents' final argument, although there may be, as a theoretical matter,

conditions under which Petitioner could be detained that would not violate his constitutional

rights, the record in this case provides no reason for the Court to believe Respondents could

realistically create such conditions on an appropriate timeline.[23]  Moreover, Respondents have

thus far taken no action to address the particular risks posed to Petitioner.  Petitioner, on the

other hand, has presented evidence from public health experts stating that release is "critically

important," Stern Decl. at ¶ 9, and that ICE "must release," Greifinger Decl. at ¶ 33, high-risk

individuals like Petitioner to mitigate the risk posed by COVID-19.  *See also* Stern Decl. at ¶ 11;

Greifinger Decl. at ¶ 35.  Based on the evidence in the record, the Court concludes that the only

adequate remedy at this time is to order Petitioner released from detention on appropriate

conditions of supervision to be set by ICE.  *See, e.g.*, *Malam*, 2020 WL 1672662, at *13.

---

[23] For example, although Dr. Malakhova attested at the beginning of April 2020 that detainees could maintain six feet between themselves while in the medical clinic, a more recent declaration from a detainee states that he was not able to maintain six feet of social distance while waiting for an appointment in the medical clinic, and when this detainee asked staff to remedy the situation, they were nonresponsive.  Thus at least in some instances, even established procedures to protect detainees are not being enforced.

ORDER – 41

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

### IV.    CONCLUSION

The Court GRANTS Petitioner's motion for a temporary restraining order.  Dkt. #19.
Respondents are ORDERED to immediately release Petitioner on reasonable conditions of
supervision.  Respondents have not sought bond and the Court finds that no security need be
posted.  *See* Fed. R. Civ. P. 65(c).

The temporary restraining order will expire on May 12, 2020.  No later than May 6, 2020,
Respondents must show cause why this Order should not be converted to a preliminary
injunction.  Petitioner may file a response no later than May 8, 2020.

DATED this 28th day of April, 2020.


RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE

ORDER – 42